IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY FLOWERS, ) | |
| ) | |
| Plaintiff, ) | No. 09 C 2716 |
| ) | |
| vs. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| C.O. OWENS #1585, SGT. CHESTER #1435, ) | |
| C.O. BROOKS #1646, C.O. CALDERON #1798, ) | |
| C.O. BAIKIE #1692, C.O. LOPEZ #1719, ) | |
| SHERIFF OF WILL COUNTY and ) | |
| COUNTY OF WILL, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION AND FACTUAL BACKGROUND**

Mr. Flowers has sued the defendants under 42 U.S.C. §1983, claiming that in May 2007 he was beaten while in custody at the Will County Correctional Facility. The Complaint seeks compensatory and punitive damages for physical injuries and what is laconically described as "emotional[ ]" "suffer[ing]." (*Complaint*, ¶28). Mr. Flowers was seen for a time after the incident by a psychologist/social worker. A question arose during discovery regarding the effect of the claim for emotional damages on the psychotherapist-patient privilege, which shields from disclosure any confidential communications between a psychotherapist or social worker and a patient in the course of diagnosis or treatment. *Jaffe v. Redmond,* 518 U.S. 1, 15 (1996).

Counsel for the parties reached an agreement (or at least they thought they had) on the record at the plaintiff's deposition that he would not introduce any expert testimony at trial regarding his emotional suffering, and that he was limiting his claim to what is often called "garden variety"

emotional damages. The parties agreed to abide by Judge Kennelly's formulation in *Santelli v. Electro-Motive*, 188 F.R.D. 306 (N.D.Ill. 1999), under which evidence of "garden variety" emotional damages is limited to "the negative emotions that [plaintiff] experienced as the intrinsic result of defendant's alleged conduct," such as "humiliation, embarrassment, and other similar emotions," but excluding "any resulting symptoms or conditions that [he] might have suffered," including "sleeplessness, nervousness, [and] depression...." *Santelli*, 188 F.R.D. at 309. No expert evidence is presented on the emotional damage issue, and there is no waiver of the privilege. (*Plaintiff's Motion For Protective* Order, Ex. A, Transcript of Deposition, 5/4/10, of Jeffrey Flowers at 165)("*Motion*"); (*Response to Motion to Compel,* Ex. A., at 465, 498, *et seq.*)("*Response*").[1]

This sort of arrangement is not uncommon in this District, *see e.g., Breunlin v. Village of Oak Park*, 2008 WL 1924894, 2 (N.D.Ill. 2008); *Saket v. American Airlines*, 2003 WL 685385 (N.D.Ill. 2003), and should have settled the waiver and other related questions.[2] But as so often occurs in these cases, it became apparent that the parties had very different notions of what could grow in the garden.

---

[1] Absent such an agreement, even the kind of terse reference to emotional damages in Mr. Flowers' complaint may be sufficient, *at least initially and without some privilege objection by the plaintiff*, to inject the issue into the case. *Compare Schlagenhoff v. Holder*, 379 U.S. 104, 119 (1964)("Of course, there are situations where the pleadings alone are sufficient to meet these requirements. A plaintiff in a negligence action who asserts mental or physical injury... places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury."); *Nolan v. IBT Health & Welfare and Pension Funds, Local 705,* 199 F.R.D. 272, 276 (N.D.Ill. 2001). Many courts would reject this conclusion. *See infra* at 8, *et seq.* Of course, a plaintiff can change his mind and withdraw any claim for emotional damages, thereby making irrelevant treatment records and mooting the question of waiver of any psychotherapist/patient privilege. *See Kronenberg v. Baker & McKenzie LLP*, _F.Supp.2d_, 2010 WL 4055947 (N.D.Ill. 2010); *Santelli*, 188 F.R.D. at 309.

[2] An agreement to limit an emotional damage claim to "garden variety emotional damages," limits not only the extent of allowable discovery by the defendant, but also limits the proof at trial and the amount of recoverable damages. *See Zhao v. East Harlem Laundromat, Inc.*, 2010 WL 4642459, 4 (S.D.N.Y. 2010); *Olsen v. County of Nassau,* 615 F.Supp.2d 35, 46-47 (E.D.N.Y.2009); *Lynch v. Town of South Hampton*, 492 F.Supp.2d 197, 207 (E.D.N.Y. 2007).

The dispute surfaced when counsel for the defendants at the July 16, 2010 session of Mr. Flowers' deposition asked him whether he had problems leaving his home because of what occurred at the jail. Mr. Flowers said that he did and that he had "anxieties about it, yes." (*Response*, Ex. A at 466-467). When asked, "why do you not leave the house since May 2, 2007," Mr. Flowers responded that he feared "retaliation by the Will County Sheriff's Department, the Joliet Police Department, and any Will County law enforcement agency in my town." He went on to say that whenever he saw any of these people, it "[j]ust brings back what happened on May 2nd of 2007, and I'm not trying [sic] to deal with it. So that is why I'm limited to when I leave the house or who I go out the house with." (*Response*, Ex. A at 467). Mr. Flowers said he now feared "anybody with a gun," and went on to say that he meant that he feared law enforcement officers. He said that he was fearful of retaliation and that he is constantly "in fear of the people involved in this case." (*Response*, Ex. A at 472, 467).

Counsel for the plaintiff announced that he planned to introduce evidence at trial that plaintiff "does not want to leave his home because he's afraid of the defendants," whom he believes will retaliate against him. (*Response*, Ex. A at 502). He posed the issue as being whether the plaintiff's on-going fear that if he left his house he was going to be harmed by Joliet or Will County officers constituted "garden variety" emotional damages. (*Response*, Ex. A at 506-508). Mr. Horowitz thought it did; Mr. Moran disagreed. The plaintiff's Motion for Protective Order followed.

The Motion seeks to preclude defendants from obtaining discovery into plaintiff's mental health records and from deposing his psychologist/social worker. Finally, the Motion seeks to have returned any mental health records the defendants have already obtained in discovery.[3] As narrowly

---

[3] No argument has been advanced in the Response that the records the defendants have obtained are not privileged or that by some act or omission by Mr. Flowers in connection with their acquisition they have

(continued...)

phrased in the Motion, the issue is whether testimony by Mr. Flowers at trial that as a result of his encounter with the defendants he has a "distrust of police and correctional officers" is outside the scope of garden variety damages. (*Motion,* at 1). The Motion answers the question in the negative by positing that the emotional damages claimed by Mr. Flowers "relat[e] only to 'the negative emotions that [he] experienced essentially as the intrinsic result of the defendants' alleged conduct,' *i.e.*, the pain and suffering and the feelings of fear, humiliation and anxiety he experienced as a result of the Defendant Officers' misconduct." (*Motion*, at 2; Ex. A to Motion at 499-500). But this begs the question and understates the issue by neglecting much of the deposition testimony, which it is fair to assume, gives a preview of what is to come at trial.[4]

The defendants are concerned that plaintiff's claim of persisting fear and anxiety about leaving the house is a subtle claim of agoraphobia and does not qualify as garden variety emotional damage. (*Response*, at 2, ¶ 4).[5] According to the Response, if plaintiff chooses to present the kind of evidence at trial about which he testified at the deposition, he should be deemed to have waived his

---

[3](...continued)
lost their privileged status.

[4] The Motion also contends that since Plaintiff "will not seek to introduce evidence of resulting symptoms or conditions *that Plaintiff may have sought psychological treatment for,*" discovery relating to this treatment is impermissible. (*Motion,* at 2)(Emphasis supplied). The conclusion does not follow from the premise. The question of whether emotional harm may properly be designated "garden variety" emotional harm is not decided by a plaintiff's decision not to introduce evidence of resulting symptoms or conditions for which a plaintiff sought psychological treatment. The critical inquiry is the nature and severity of the claimed emotional harm, not counsel's decision to forgo evidence at trial. *See Lanning v. Southeastern Pennsylvania Transp. Authority (SEPTA),* 1997 WL 597905, 2(E.D.Pa.1997). For example, a plaintiff's failure to have consulted a medical health professional or to introduce expert testimony if he had does not transmute chronic depression, posttraumatic stress disorder, clinical depression, or any other serious condition into a garden variety emotion.

[5] While the Response says that Mr. Flowers cannot introduce evidence at trial of agoraphobia through his own testimony, it makes no attempt to define agoraphobia or to show that Mr. Flowers' testimony reflects that condition.

psychotherapist-patient privilege as to his mental health treatment.

After review of the Motion, the Response, and the snippets of deposition testimony submitted by the defendants in response to the Motion, I asked the parties to provide me with any additional excerpts of the deposition that they thought bore on the question presented by the Motion. The additional pages of the deposition provided by the defendants some days ago are significant and revealing. What emerges from the plaintiff's testimony is a claim of emotional suffering that transcends garden variety emotional harm permitted by *Santelli* and scores of other cases.

During the deposition, plaintiff's counsel was emphatic that his client "suffers from a psychological condition" and has "psychological issues." (*Supplement to Ex. A to Response*, at 88, 138)(#139). Mr. Flowers' own portrayal of his emotional suffering – even in its obstructed form (and taken as true) – if not consistent with this assessment, is inconsistent with emotional damage that is "intrinsic" to what occurred on May 2, 2007.[6]

Mr. Flowers said that he continues (three years later) to get depressed about what happened with the defendants. (*Id.* at 84-85). He said, in answer to the question "you told me earlier you don't

---

[6]Throughout the deposition on July 16, defense counsel's examination of Mr. Flowers was repeatedly interrupted by extended objections, which, if not designed to obstruct inquiry into the emotional impact of the encounter with the defendants, at least had that effect. *(See Supplement to Exhibit A to Response* at 85, 86-91, 94, 138-141, 143, 468-471, 474, 483-486, 486-488)(Dkt. #139). (Whether or not there are other such objections is impossible to say since I only have only a few portions of the transcript). The constant interruptions, which were almost always limited to questions related to the plaintiff's mental suffering and which invariably resulted in the plaintiff's claimed inability to understand or respond to the question, are especially troublesome in light of my order of May 27, 2010 [Dkt. #92] in which much the same thing had occurred (although perhaps not on the same scale). On one occasion during the July deposition, the plaintiff – improperly, *Redwood v. Dobson*, 476 F.3d 462, 468 (7th Cir. 2007) – was told not to answer this simple question: "have you made any effort on your own to call an eye doctor to determine how much it would cost for one appointment?" (*Supplement to Ex. A to Response*, at 143). When the defendants' counsel asked his opponent to stop his constant coaching of Mr. Flowers, he was told: "I am going to say whatever it is I want to say." (*Id*. at 139). Another manifestly improper interruption, *see Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558 (7th Cir. 2006), occurred when the plaintiff's lawyer vigorously objected that the questioning regarding plaintiff''s claim that he was depressed involved psychiatric terms.

leave your house much, right," "not like I used to." (*Id*. at 95). In fact, he said he hadn't gone fishing in the three years after his encounter with the defendants in May 2007. (*Id.*). He was, he said, still depressed, because of what occurred on May 2nd. (*Id*. at 86).[7] Mr. Flowers said that he had "anxieties" about leaving his house as a consequence of the defendants' conduct and his fear of retaliation by law enforcement officers. (*Id*. at 466-467). So significant were these anxieties, that he said he was "limited to when I leave the house or who I go out [sic] the house with." (*Id*. at 467). Before Mr. Flowers could answer the question whether his "anxiety prevent[ed] [him] from doing any activities right now," his lawyer interjected, saying "hold on," claiming that Mr. Flowers had just said "he doesn't have an anxiety," and accused defense counsel of engaging in a "form of manipulation pattern [sic]." (*Id*. at 469). Mr. Flowers ultimately testified that he was in constant fear of the people involved in the case, and referred to "what you call anxiety attacks" about the people involved in the case. (*Id*. at 472, 477).

Despite repeated interruptions of the questioning by defense counsel, Mr. Flowers said that he did stay at home "now more often than [he] ever did because of what occurred" on May 2nd. (*Id*. at 475). He also said that he was fearful of "any Will County law enforcement agency" – that is where his home is – and that he was comfortable leaving his home to go to places in Will County only if he was "with people that have never been in trouble, that are retired citizens that I know the Joliet police will not test and Christians that go to church every day...." (*Id*. at 476). In the end, when asked whether he was affected in any other way emotionally than what he had described, Mr. Flowers said:

---

[7] At this point, plaintiff's lawyer immediately and improperly interjected saying, "Stop. You are injecting so much confusion." There then followed four pages of needless and improper disruption, which predictably ended with the plaintiff, when asked again about whether he felt depressed, saying that he wasn't a psychiatrist and that he couldn't "answer that question about depression." (*Id.* at 86-89). Further needless interruptions by counsel occurred. *Id*. at 89-90, 138-140.

"Sir, I'm going to be effected [sic] my whole life by this." A moment later he again said that "[d]ue to the abuse at the hands of Will County Sheriff and all people involved, I'll have to deal with this my whole life." (*Id*. at 483-484).

Shortly thereafter, he said that every time his back is hurting or he sees a police car in Will County he experiences "anxieties," (*id*. at 486), which he went on to explain required him to deal with and to think about the individuals who hurt him and to think about "that I really don't know who they are face-to-face that would do this" – "I'm talking about the people in Will County." (*Id*. at 489). He concluded by saying that he, in fact, had ongoing emotional reactions as a consequence of the events of May 2nd but he could not state what they are "until I see them or address them on a daily basis." (*Id*. at 489). But he was quite emphatic as to one of those situations: "every time I go through Crest Hill I think how a cop tried to put me in prison lying." (*Id*. at 490).[8] The deposition ended with Mr. Flowers saying that his relationship with his daughter was not one of the causes of his "emotional problems," and that he did not know whether he had any "emotional problems" outside of what occurred on May 2nd. (*Id*. at 497).

The above excerpts from the deposition came from the materials provided by the defendants. The plaintiff did not file any additional transcript citations. Instead, on April 20th, a six-line Supplement to the Motion for Protective Order was submitted, stating that "[r]egardless of what Plaintiff said in his deposition," he is voluntarily limiting the scope of his emotional damages "to emotional distress attributable to fear associated of [sic] seeing these specific Defendant officers."

---

[8] Oddly though, he said that he did not give any thought to and was not "emotionally affected" by the incident in which he was accused of shooting someone with a shot gun, which resulted in a conviction for home invasion, or any "of the other instances in which [he had] been convicted of a crime," which had resulted in periods of incarceration." Later he said that he did not know whether those convictions had an "emotional impact" on him. (*Id*. at 490-495).

This, the plaintiff "believes" is "garden variety emotional distress and the intrinsic result from the Defendants' conduct." (#141).

**ANALYSIS**

The federal common law psychotherapist-patient privilege shields from disclosure any confidential communications between a licensed psychotherapist or social worker and a patient in the course of diagnosis or treatment. *Jaffe,* 518 U.S. at.15. The privilege serves to protect the relationship of confidence and trust on which effective psychological treatment depends and thus "serve[s] a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."*Id.* Like other testimonial privileges, however, the privilege may be waived. *Id.* at 15 n. 14. On that question however the Court offered no guidance, believing it neither necessary nor feasible to delineate the full contours of the privilege in a way that would "'govern all conceivable future questions in this area.'" *Id*. at 18. What was not left for future development was the rejection of the principle that the privilege could be defeated by a judge's evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure. *Id*. at 17.[9]

After *Jaffe*, the courts have been unanimous in holding that a party may surrender the psychotherapist-patient privilege by affirmatively placing his or her psychological state at issue in the suit. *Doe v. Oberweis Dairy,* 456 F.3d 704, 718 (7th Cir. 2006), *cert. denied*, 549 U.S. 1278 (2007); *Schoffstall v. Henderson,* 223 F.3d 818, 823 (8th Cir.2000)(collecting cases). The difficulty lies in determining when that occurs. Two lines of analysis, *Williams v. Troehler,* 2010 W L 121104, 2 -3 (E.D.Cal.2010), – some say three, *Beltran v. County of Santa Clara,* 2009 WL 248207, 2 (N.D.Cal.

---

[9] Thus the relevance of and need for the evidence does not make it discoverable. *See Kronenberg*, _F.2d_, 2010 WL 4055947; *Santelli; Vanderbilt v. Town of Chilmark,* 174 F.R.D. 225, 229 (D.Mass. 1997).

8

2009) – have evolved. A numerical minority finds waiver whenever emotional distress damages of any kind are sought. *See Fisher v. Southwestern Bell Tel.Co.,* 2010 WL 257305, 3 (10th Cir.2010)("We agree with the district court that Ms. Fisher's request for emotional-distress damages placed her psychological state in issue and entitled SWBT to discover her therapy records."); *Doverspike v. Chang O'Hara's Bistro, Inc.,* 2004 WL 5852443, 2 -3 (D.Minn. 2004)("'As between the two approaches, the cases finding that even garden-variety distress claims waive applicable privileges are better reasoned ... emotional distress is either part of the case or it is not.'"); *Sanchez v. U.S. Airways, Inc.,* 202 F.R.D. 131, 136 *(*E.D.Pa. 2001); *Kirchner v. Mitsui & Co. (U.S.A.), Inc.*, 184 F.R.D. 124 (M.D.Tenn.1998); *Lanning v. Southeastern Pennsylvania Transportation Authority,* Nos. 97-593 & 97-1161, 1997 WL 597905, 6 (E.D.Pa. 1997).

It is not clear whether this is the Seventh Circuit's position. *Beltran v. County of Santa Clara, supra,* reads *Oberweis Dairy* as reflecting that it is, and the D.C. Circuit's opinion in *Koch v. Cox*, 489 F.3d 384, 390 (D.C.Cir. 2007) at least hints that *Oberweis Dairy* can be interpreted as holding that a waiver results whenever a claim for emotional distress is made – although it did not have to decide what was meant. Prior to *Oberweis Dairy*, even Judge Kennelly in *Santelli* expressed the view that "[t]here is some support for this approach in this Circuit." 188 F.R.D. at 309. And, the phrasing in *Oberweis Dairy* arguably supports a narrow view of the privilege even where the emotional damages are claimed to be "garden variety."

Although the district court in *Oberweis Dairy* had discussed "garden variety" emotional damages and cited *Santelli*, 2004 WL 1146712, 3, the Seventh Circuit's affirmance of the district court's decision to allow "the defendant access to the plaintiff's psychiatric records," neither mentioned *Santelli* nor used the phrase "garden variety." Instead, the Seventh Circuit said: "[I]f a plaintiff *by*

*seeking damages for emotional distress* places his or her psychological state in issue, the defendant is entitled to discover any records of that state." 456 F.3d at 718 (Emphasis supplied).[10]

But the issue need not be decided in this case in light of the defendants' concession that a claim for garden variety emotional damages does not waive the privilege and the parties' agreement that *Santelli* controls. (*Response* at 2, ¶4).

Others courts only find waiver where, for example, the emotional distress claims are "severe," *Koch,* 489 F.3d at 390; *Ortiz v. Potter,* 2010 WL 796960, 6 (E.D.Cal.2010); where one's mental state is part of the claim or defense, and "not merely a parasitic claim," *Doe v. City of Chula Vista*, 196 F.R.D. 562, 568-69 (C.D.Cal.1999); *Sanchez,* 202 F.R.D. at 136; where a party relies on communications with a therapist or where a specific mental or psychiatric disorder is alleged, *Walton v. North Carolina Dept. of Agriculture and Consumer Services,* 2011 WL 883579, 3 (E.D.N.C. 2011)(depression and posttraumatic stress disorder); *Jackson v. Chubb Corp.,* 193 F.R.D. 216 (D.N.J. 2000); or where a party intends to offer expert testimony, whether from a treating doctor or one specially retained to render an expert opinion, to support a claim of emotional distress. *See also Koch,* 489 F.3d at 390; *St. John v. Napolitano,* 2011 WL 1193009, 4-6 (D.D.C.2011); *Diehl v. Bank of America Corp*. 2010 WL 4829970,1 -2 (M.D.Fla. 2010).[11]

---

[10] Of course, care must be taken not to place exaggerated reliance on generalized statements in opinions. *See Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006).

[11] For example, in an ADA case, if the plaintiff affirmatively claims a "disability" involving mental health, there is an implied waiver. *See e.g., Jackson,* 193 F.R.D. at 226 n.8; Wynne v. Loyola Univ. of Chicago, 1999 WL 759401 (N.D.Ill.1997)(the claimed disability was "major depression"); *Metzger ex rel. Anderson v. Francis W. Parker School,* 2001 WL 910443 (N.D.Ill.2001)(claimed disability was attention deficit hyperactivity disorder and co-existing related emotional conditions). *Cf. United States v. Wilk,* 572 F.3d 1229, 1236 (11th Cir.2009)(defendant's mental status was central to his defense); *Darst v. Interstate Brands Corp.,* 512 F.3d 903 (7th Cir.2008)(in an FMLA interference /entitlement action, since the employee must demonstrate an entitlement to FMLA leave, medical records were discoverable).

In these and comparable circumstances, waiver is based upon the obvious principle of fairness that a party "cannot inject his or her psychological treatment, conditions, or symptoms into a case and expect to be able to prevent discovery of information relevant to those issues." *Santelli,* 188 F.R.D. at 309. *E.E.O.C. v. California Psychiatric Transitions,* 258 F.R.D. 391, 399 - 400 (E.D.Cal.2009) phrased it this way: "it is only fair to allow Defendant access to the information. To protect the records would allow Plaintiff to proceed with a claim on unequal terms. If [a plaintiff] wants a jury to compensate [him] for emotional distress, Defendant should be able to explore in discovery, other circumstances that may have caused the injury. The court can be the gatekeeper of the ultimate admissibility of the evidence through a Rule 403 balancing analysis at trial. A protective order, and a direction that any of the disclosed material filed with the court must be done under seal, will protect [the plaintiff's] privacy rights." *Cf. In re Grand Jury Proceedings,* 219 F.3d 175, 182 (2nd Cir.2000)("implied waiver...where the privilege holder 'asserts a claim that *in fairness* requires examination of protected communications.'")(attorney client privilege); *Lorenz v. Valley Forge Insurance. Co.,* 815 F.2d 1095, 1098 (7th Cir.1987)("Implicit disclosure can occur when a holder ... relies on a legal claim or defense, the truthful resolution of which will require examining confidential communications."). The parlance often employed in the cases is that one cannot use a privilege as both a sword and a shield. *In re Grand Jury Proceedings,* 219 F.3d at 182; *In re Sims*, 534 F.3d at 132; *Santelli*, 188 F.R.D. at 308; 21 C. Wright & K. Graham, Federal Practice and Procedure § 5039 at 828 (2005).

Since *Jaffe*, most courts have held that claims of "garden variety" emotional damage do not result in a waiver of the psychotherapist/patient privilege. *In re Sims,* 534 F.3d 117, 129 (2nd Cir. 2008); *Koch*, 489 F.3d at 390; *Diehl v. Bank of America Corp*. 2010 WL 4829970, 1 - 2

(M.D.Fla.2010).[12] The problem in these cases is definitional and stems from the imprecision and elasticity of the phrase "garden variety."[13] The courts' formulations vary, but the thought they seek to convey is the same. Garden variety emotional damages are: "the distress that any healthy, well-adjusted person would likely feel as a result of being so victimized," *Kunstler v. City of New York*, 2006 WL 2516625, 9 (S.D.N.Y.2006); "the generalized insult, hurt feelings and lingering resentment which anyone could be expected to feel" given the defendant's conduct, *Owens v. Sprint/United Mgmt. Co.,* 221 F.R.D. 657, 660 (D.Kan. 2004); the "normal distress experienced as a result of the [claimed injury]," *Carr v. Double T Diner,* 2010 WL 3522428, 3(D.Md.2010); "the negative emotions that [plaintiff] experienced essentially as the intrinsic result of the defendant's alleged conduct," but not the "resulting symptoms or conditions that she might have suffered," *Santelli*, 188 F.R.D. at 309; *accord Saket*, 2003 WL 685385; *Doe v. Oberweis Dairy,* 2004 WL 1146712, 3 (N.D.Ill. 2004); the "'generalized insult, hurt feelings, and lingering resentment that does not involve a significant disruption of the plaintiff's work life and rarely involves more than a temporary disruption of the claimant's personal life,'" *Ortiz,* 2010 WL 796960, 3; the "ordinary or commonplace," "simple or usual," *Rhodes v. County of Placer,* 2011 WL 130160, 5 (E.D.Cal. 2011); *Valentine v. First*

---

[12] The opinions are almost exclusively from district and magistrate judges, which are not binding even in the districts in which the court sits. *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 573 (7th Cir. 2009).

[13] Imprecise and elastic phrases bedevil the law. "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing...." Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 455 (1899). *See also, Lorenzo v. Wirth*, 170 Mass. 596, 600, 49 N.E. 1010 (1898)(Holmes, J.)("Too broadly generalized conceptions are a constant source of fallacy."). The Seventh Circuit has also warned against uncritical reliance on labels and catch phrases. *See Meridian Security Insurance Co. v. Sadowski*, 441 F.3d 536 (7th Cir. 2006)(Posner, J.)("The phrase [reasonable probability] acquired a life of its own"; "the turn of the phrase was infelicitous.");*Back Doctors Ltd. v. Metropolitan Property and Cas. Insurance Co.*, _F.3d_, 2011 WL 1206184, 1 (7th Cir 2011)(Easterbrook, C.J.)("Our 2006 opinion traced the phrase's origin and evolution in connection with the amount-in-controversy requirement and concluded that it had been misunderstood so frequently that it had to go.").

12

*Advantage Saferent Inc.* 2009 WL 3841967, 1 (C.D.Cal. 2009); those that do not involve psychological treatment or adversely affect any "'particular life activities,'" *Press v. Concord Mortgage Corp.*, 2009 WL 6758998, 7 (S.D.N.Y. 2009); those where the plaintiff describes his or her distress "in vague or conclusory terms," but does not describe "the[ir] severity or consequences," *Wallace v. Suffolk County Police Dept.*, 2010 WL 3835882, 9 (E.D.N.Y. 2010); or those that involve the general pain and suffering and emotional distress one feels at the time of the complained-of conduct, but not any ongoing emotional distress. *Kim v. Interdent Inc.,* 2010 WL 1996607, 1 (N.D.Cal. 2010).

Claims for emotional damage "'are...easy to manufacture.'" *Sarver v. Experian Information Solutions,* 390 F.3d 969, 971 (7th Cir. 2004). But, since garden variety emotional suffering involves those feelings that would likely be experienced by anyone who experienced what the plaintiff alleges occurred, prohibiting a party's access to non-privileged information, does not compromise the ability of the opponent to contest the evidence of emotional damage and thus does not offend notions of fairness. Just as "vigorous cross examination and the presentation of contrary evidence" are the anodyne for shaky expert testimony, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596 (1993), so too are they sufficient to test claims of garden variety emotional damage without resort to otherwise privileged information. At least that is the theory implicit in the cases that hold that simply raising a "garden variety" claim of emotional damage does not result in a waiver of the psychotherapist/patient privilege.

A plaintiff claiming emotional damages can, in certain circumstances, testify about the emotional reactions resulting from the defendants' conduct without presenting any medical evidence and that testimony alone may suffice to sustain the claim. *See, e.g. Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558 (7th Cir. 2006); *Deloughery v. City of Chicago*, 422 F.3d 611 (7th Cir.

2005).¹⁴ After all, "'[t]he state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove ..., but if it can be ascertained it is as much a fact as anything else.'" *O'Sullivan v.'Sullivan v. City of Chicago,* 474 F.Supp.2d, 971, 974, n.3 (N.D.Ill. 2007)(citing *Arave v. Creech,* 507 U.S. 463, 473 (1993). *Cf., United States. v. Vrdolyak,* 593 F.3d 676, 679 (7th Cir. 2010)("No rule of evidence or principle of common sense makes a person's testimony about his own intentions-testimony uniquely based on his personal knowledge-inadmissible in a sentencing proceeding any more than in any other proceeding in which intention is material.").¹⁵ The weight to be accorded the testimony of witnesses who testify about emotional distress is for the jury to determine under appropriate instructions. *Carey v. Piphus*, 435 U.S. 247, 264, n. 20 (1978); *Harvey v. Office of Banks and Real Estate,* 377 F.3d 698, 715 (7th Cir. 2004).

Where does all this leave the plaintiff? Prior to the plaintiff's supplemental filing, it could be concluded that plaintiff could, consistent with his promise to abide by and be bound by the *Santelli* formulation, testify generally about his humiliation, embarrassment, anger, and feeling depressed,

---

¹⁴ *But cf. Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1229-30 (7th Cir. 1995)(plaintiff's claim of continuing emotional anguish was not "adequately established by [his] brief testimony.").

¹⁵ *See also, Tullis v. Townley Engineering & Mfg. Co., Inc.*, 243 F.3d 1058, 1067-68 (7th Cir. 2001); (plaintiff testified that he felt low and degraded, backstabbed, had serious financial difficulties); *Fleming v. County of Kane*, 898 F.2d 553, 561-62 (7th Cir. 1990)(Plaintiff testified to feelings of embarrassment, humiliation, certain depression, serious headaches, and sleeplessness, which was supported by his wife and fellow employees); *E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285-86 (7th Cir. 1995)(plaintiff who was dying from cancer and was wrongfully discharged testified to his depression, rage and fear resulting from his sudden firing, resulting in his being cut off from "one of the major defining aspects of his life" and which "forced [him] to watch his family suffer emotionally and financially"); *O'Sullivan v.'Sullivan v. City of Chicago,* 474 F.Supp.2d, 971, 975 *et seq* (N.D.Ill.2007)(plaintiffs testified about effects of discrimination and retaliation); *Tomao v. Abbott Laboratories, Inc.*, 2007 WL 2225905, 13-14 (N.D.Ill. 2007).

The issue presented in the instant case was not raised in any of these cases, which involved the sufficiency of the testimony to sustain the jury's damage award, not whether the testimony exceeded the bounds of what is permissible in garden variety emotional damage claim cases.

anxious and dejected as a result of his encounter with the defendants.[16] He could also testify generally that he feels uncomfortable about going into a restaurant if a Will County police officer is there, and that if he did go in he "wouldn't enjoy [his dinner]." (*Tr*. at 468). These are the kinds of ordinary and usual emotions that one in Mr. Flowers' position would feel. Phrased differently, they are sufficiently intrinsic to the events of May 2nd that they may be properly classified as garden variety.

Mr. Flowers' own Motion recognizes that garden variety damage claims preclude "inject[ion] into the case [of] either the fact of [plaintiff's treatment] or any symptoms or conditions that she may have experienced for the purpose of proving her damages." (*Motion* at 5). Hence, he could not testify about resulting symptoms or conditions such as his claimed persistent and pervasive fear of retaliation by the Will County Sheriff's Department, the Joliet Police Department, and everyone involved in the case and still maintain the psychotherapist/patient privilege. *Santelli*, *supra*; *Dotson v. City of Syracuse,* 2011 WL 817499, 21 (N.D.N.Y.2011)(Plaintiff's testimony and evidence regarding her damages was brief, conclusory and vague. Plaintiff provided no testimony regarding the duration or consequences of her alleged injuries."). Nor could he testify that he is afraid to leave his home in Will County even to go fishing, unless he is "with people that have never been in trouble, that are retired citizens that [he] know[s] the Joliet police will not test and Christians that go to church every day...." (*Tr*. at 476). *See Menghi v. Hart*, 745 F.Supp.2d 89, 107 (E.D.N.Y. 2010)(testimony of "long-term injuries" such as checking doors and windows constantly, inability to go out at night or to the gym alone, a reluctance to leave the house and fears about being pulled over by a police officer "clearly exceeded the 'garden variety' claims" of emotional damage).

---

[16] At his deposition, Mr. Flowers, when asked whether he felt embarrassed after the attack on May 2nd, said, "I don't know." (*Tr*. at 478).

Equally out of bounds would be testimony by Mr. Flowers that he relives the events of May 2nd whenever he sees Will County or Joliet police officers or a police car in Will County. *Kankam v. University of Kan. Hosp. Authority,* 2008 WL 4369315, 4 (D.Kan. 2008)(plaintiff "thinks about what was done to her everyday"); *Sarko v. Penn-Del Directory Co.,* 170 F.R.D. 127, 131 (E.D.Pa. 1997) (where plaintiff claimed her depression "has had a long-term impact on her mental state," her mental state was at issue). *But see Sims v. Lakeside School*, 2007 WL 5417731 (W.D.Wash. 2007)("relived experience,"discouragement, anger, depression, sleep loss, withdrawal are garden variety emotional distress symptoms).

The more extreme reactions about which Mr. Flowers testified at his deposition bear more of a similarity to the symptoms of agoraphobia or posttraumatic stress disorder ("PTSD") than they do to the kinds of simple, usual, or ordinary emotions that courts have permitted plaintiffs to testify about without a resulting waiver of the psychotherapist/patient privilege. For example, the Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 4th ed. 2000)("DSM-IV") lists the "Features" of agoraphobia as including anxiety about being in places or situations from which escape might be difficult or embarrassing. The anxiety typically leads to a pervasive avoidance of a variety of situations that may include being alone outside the home or being home alone. "Often an individual is better able to confront a feared situation when accompanied by a companion." (DSM-IV at 432).

Among the "Diagnostic Features" for Posttraumatic Stress Disorder in the DSM-IV are:

The essential feature of Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury

experienced by a family member or other close associate (Criterion A1). The person's response to the event must involve intense fear, helplessness, or horror (or in children, the response must involve disorganized or agitated behavior) (Criterion A2). The characteristic symptoms resulting from the exposure to the extreme trauma include persistent reexperiencing of the traumatic event (Criterion B), persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (Criterion C), and persistent symptoms of increased arousal (Criterion D). The full symptom picture must be present for more than 1 month (Criterion E), and the disturbance must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning (Criterion F).

DSM-IV at 463.

The DSM-IV states that the traumatic events that can lead to PTSD include, but are not limited to, "military combat, *violent personal assault* (sexual assault, *physical attack*, robbery, mugging), being kidnapped, being taken hostage, terrorist attack, torture. .... *The disorder may be especially severe or long-lasting when the stressor is of human design* (e.g., torture, rape). The likelihood of developing this disorder may increase as the intensity of and physical proximity of the stressor increase. The traumatic event can be *reexperienced* in various ways. *Commonly, the person has recurrent and intrusive recollections of the event.* ... These episodes, often referred to as 'flashbacks' are typically brief. ... Intense psychological distress (Criterion B4) or physiological reactivity (Criterion B5) often occurs when the person is exposed to triggering events that resemble or symbolize an aspect of the traumatic event (e.g., ...uniformed guards for survivors of death camps). ... *Stimuli associated with the trauma are persistently avoided.* The person commonly makes deliberate efforts to avoid thoughts, feelings, or conversations about the traumatic event ... *and to avoid* activities, situations, or people who arouse recollections of it....." (Emphasis supplied)(Parentheses in original).

This is not to say that Mr. Flowers is suffering from agoraphobia or PTSD. Mr. Flowers makes no such claim, and only a qualified medical professional can make that diagnosis. But the similarities between some of Mr. Flowers' claimed emotional reactions and the diagnostic criteria for these

17

disorders are striking and tend to further support the conclusion – *which exists independently in any event*– that much of Mr. Flowers' claimed emotional suffering cannot fairly be called "garden variety."

This is not to say that Mr. Flowers will be precluded from proving at trial with "competent evidence," *Carey*, 435 U.S. at 264, n. 20, all that he testified about at his deposition. It is, however, to say that he will not be allowed to do so and still insist on maintaining his psychotherapist/patient privilege. Of course, "[b]are testimony of humiliation or disgust may prevent [him] from fully recovering for h[is] alleged emotional distress. [He] may be better off disclosing [his] psychological records, which would allow [him] to make a broader damage claim." *Santelli*, 188 F.R.D. at 309. But that is a choice exclusively for Mr. Flowers and his counsel to make. The Supplement to the Motion for Protective Order has not made that choice.

The Supplement purports to "limit" and "narrow" the scope of his claim for emotional damages to that "emotional distress attributable to fear associated of [sic] seeing these specific defendant officers." But if we "think things, not words," Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 460 (1889), the Supplement's formulation makes no substantive difference in the critical issue in the case. It should be recalled that plaintiff's counsel at the deposition posed the issue as being whether the plaintiff's on-going fear that if he left his house he was going to be harmed by Joliet or Will County officers constituted "garden variety" emotional damages. (*Response*, Ex. A at 506-508). The Supplement does not disavow that issue or represent that the plaintiff proposes simply to testify without any elaboration that he is presently afraid of the defendants. It does not, for example, represent that Mr. Flowers does not intend to explain through his testimony and/or that of friends and family members how the "fear" of the defendants has manifested itself and to explain its continuing effect on his life.

For example, the Supplement does not represent that the plaintiff does not propose to testify that as a consequence of his continuing "fear" of the defendants, he is not in constant apprehension of retaliation by them and that as a consequence, he does not leave his house except "with people that have never been in trouble, that are retired citizens that I know the Joliet police will not test and Christians that go to church every day." At Mr. Flowers' deposition, his counsel announced that he planned to introduce evidence at trial that plaintiff "does not want to leave his home because he's afraid of the defendants," whom he believes will retaliate against him. (*Response*, Ex. A at 502). Nothing in the Supplement disavows this intent. Nor does it disavow that Mr. Flowers will attempt to testify that his "fear" of the defendants has kept him from going fishing or that he will not attempt to testify about his constant anxiety stemming from his "fear" of the defendants.

In sum, the Supplement does not change the essential thrust of the Motion or the scope of the proposed testimony at trail. It leaves unaffected the questions raised in the Motion and the Response. Without a complete explication of what it is that is being proposed by the plaintiff, it cannot be said with assurance that the trial testimony expressly envisioned by the plaintiff's counsel will, in fact, be limited to the kind of simple, usual, and ordinary emotions approved by the cases.[17] And if it is not, the plaintiff cannot insist on maintaining the psychotherapist/patient privilege. The choice of how to proceed is the plaintiff's. He cannot leave the matter in its current indeterminate state.

---

[17]The Supplement's *ipse dixit* that the plaintiff "belie[ves]" that plaintiff's "fear" – which is otherwise unexplained or elaborated on in any way – is garden variety harm cites not a single case to support the belief. Unsupported positions are not persuasive (and, indeed, can be deemed waived, although that is not the consequence here). *Gross v. Town of Cicero, Ill*. 619 F.3d 697, 704 (7th Cir.2010); *United States v. Collins,* 604 F.3d 481, 488, n. 2 (7th Cir. 2010); *White Eagle Co-opinion Ass'n v. Conner,* 553 F.3d 467, 476 n. 6 (7th Cir. 2009)(collecting cases).

## CONCLUSION

A court may issue a protective order to prevent discovery where "justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense." Fed.R.Civ.P. 26(c). The plaintiff has not made the requisite showing and accordingly his motion for protective order [#124] is DENIED.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

DATE: 4/21/11